UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                        :

In re FOREIGN EXCHANGE BENCHMARK   :
RATES ANTITRUST LITIGATION             :
                                          :
                                          :        13 Civ. 7789 (LGS)
                                          :
                                          :
                                          :
------------------------------------------------------------ X
                                          :

SIMMTECH CO., LTD.,                       :
                       Plaintiff,    :
                                          :

          -against-                  :        13 Civ. 7953 (LGS)
                                          :

BARCLAYS BANK PLC, et al.,             :
                       Defendants.   :
------------------------------------------------------------ X
                                          :
ODDVAR LARSEN,                          :
                       Plaintiff,    :
                                          :

          -against-                  :        14 Civ. 1364 (LGS)
                                          :
BARCLAYS BANK PLC, et al.,             :     OPINION AND ORDER
                       Defendants.   :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

      The three cases before the Court allege a long-running conspiracy among the world's

largest banks to manipulate the benchmark rates in one of the world's largest markets, the

foreign exchange ("FX") market.  The primary action is on behalf of U.S.-based Plaintiffs, who,

in a Consolidated Amended Class Action Complaint (the "U.S. Complaint"), allege that the

twelve defendant banks[1] violated Sections 1 and 3 of the Sherman Act (the "Consolidated Action").

The two remaining actions involve Plaintiffs who are not in the United States (the "Foreign Plaintiffs" and the "Foreign Actions").  Plaintiff Simmtech Co., Ltd., filed a Complaint (the "Simmtech Complaint") on behalf of those who traded foreign currency in South Korea with seven of the Defendants.  Plaintiff Oddvar Larson's Amended Complaint (the "Larsen Complaint") alleges similar claims on behalf of those who traded foreign currency with the Defendants in Norway (collectively, the "Foreign Complaints").  Defendants move to dismiss all three actions.  For the reasons stated below, the motions are denied as to the Consolidated Action and granted as to the Foreign Actions.

## I.   BACKGROUND

The following recitation is based on the allegations in the complaints in the three actions, documents incorporated by reference or integral to those complaints and judicially noticed facts. The allegations are assumed to be true solely for purposes of the present motions to test the sufficiency of the three complaints.

---

[1]  Defendants are Bank of America Corporation and Bank of America, N.A. (collectively, "Bank of America"); Barclays Bank PLC and Barclays Capital Inc. (collectively, "Barclays"); BNP Paribas Group and BNP Paribas North America Inc. (collectively, "BNP Paribas"); Citigroup, Inc. and Citibank, N.A. (collectively, "Citigroup"); Credit Suisse Group AG and Credit Suisse Securities (USA) LLC (collectively, "Credit Suisse"); Deutsche Bank AG ("Deutsche Bank"); Goldman Sachs Group, Inc. and Goldman, Sachs & Co. (collectively, "Goldman Sachs"); HSBC Holdings PLC, HSBC Bank PLC, HSBC North America Holdings Inc. and HSBC Bank USA, N.A. (collectively, "HSBC"); JPMorgan Chase & Co. and JPMorgan Chase Bank, N.A. (collectively, "JPMorgan"); Morgan Stanley; Royal Bank of Scotland Group PLC and RBS Securities, Inc. (collectively, "RBS"); and UBS AG and UBS Securities LLC (collectively, "UBS").  On January 5, 2015, Plaintiffs and JPMorgan filed a letter stating that they have reached a settlement in principle.  Because the settlement is yet to be approved, JPMorgan remains a party to this motion and this action.

### A.  The Consolidated Action

Unless otherwise indicated, all quotations in this Section are taken from the U.S. Complaint.

### 1.  The  Parties

The U.S. Complaint alleges that the FX market is the largest and most actively traded financial market in the world, with global trades averaging $5.3 trillion per day.  Defendants are the dominant dealers and horizontal competitors in the global FX market, with 84.25% of all trades in the market in 2013.  Plaintiffs are twelve entities, including a municipal board, investment funds, pension plans and hedge funds[2] that engaged in FX spot and outright forward transactions[3] with one or more Defendants between January 1, 2003, and March 31, 2014.

The U.S. Complaint also asserts claims on behalf of a putative class of:

> [a]ll persons who, between January 1, 2003 and the present . . . , entered into an FX instrument directly with a Defendant at or around the time of the fixing of the WM/Reuters Closing Spot Rates [i.e., the Fix, *see infra*], or who entered into an FX Instrument directly with a Defendant settled in whole or in part on the basis of WM/Reuters Closing Spot Rates, where such persons were either domiciled in the United States or its territories or, if domiciled outside the United States or its territories, transacted in the United States or its territories.

---

[2] Plaintiffs are Aureus Currency Fund, L.P.; City of Philadelphia, Board of Pensions and Retirement; Employees' Retirement System of the Government of the Virgin Islands ("Virgin Islands Retirement System"); Employees' Retirement System of Puerto Rico Electric Power Authority ("Puerto Rico Retirement System"); Fresno County Employees' Retirement Association; Haverhill Retirement System; Oklahoma Firefighters Pension and Retirement System; State-Boston Retirement System; Syena Global Emerging Markets Fund, LP; Tiberius OC Fund, Ltd.; Value Recovery Fund L.L.C.; and United Food and Commercial Workers Union and Participating Food Industry Employers Tri-State Pension Fund.

[3] According to the U.S. Complaint, spot transactions are conducted pursuant to agreements to exchange currency at "an agreed-on exchange rate on a value date within two bank business days."  Outright forwards are similar transactions that take place more than two business days out.

### 2. *The FX Market and Trading at "The Fix"*

Currencies are traded in pairs where the seller sells one currency and buys another, and the price of one currency is expressed in relation to another currency as a ratio.  To initiate an FX transaction, typically, a customer contacts a dealer bank for a quote for the relevant currency and quantity.  The dealer provides a "bid," which is the price at which the dealer is willing to buy the currency.  The dealer also quotes an "ask," the price at which the dealer is willing to sell the currency.  The difference between the bid and ask is called the "bid-ask spread," which is the basis of the dealer's compensation.  While "dealers are incentivized to quote wider bid-ask spreads," competition among them "narrows bid-ask spreads."  Currencies are commonly traded at published exchange rates called "fixing rates."  The WM/Reuters published rates "are the most important fixing rates in the FX markets" and "the primary benchmark for currency trading globally."  The U.S. Complaint alleges that Plaintiffs traded in the FX market with Defendants at, or at rates determined in large part by, "the most widely used WM/Reuters" fixing rates, the WM/Reuters Closing Spot Rates (the "Fix").

For the most widely traded currencies, the Fix is determined by the median price of actual FX transactions in the 30 seconds before and after 4 p.m. London time (the "Fixing Window").  The WM Company extracts actual market prices from electronic communications networks that Defendants use to execute orders for FX instruments, such as Reuters, Currenex and EBS.  The process is automated and anonymous.  Trading at the Fix is popular for many reasons, including reduced tracking error and the perception of "universality and independence from any specific dealer."

Plaintiffs bought FX instruments from Defendants priced at or by the Fix.  The U.S. Complaint identifies the Defendants with whom each Plaintiff traded FX instruments, and alleges that each Plaintiff traded FX instruments with at least one Defendant and each Defendant traded with at least one Plaintiff.

### 3.  *Manipulation of the Fix*

The core allegation in the U.S. Complaint is that "Defendants executed concerted trading strategies designed to manipulate, and which actually did manipulate" the Fix, allowing Defendants "to reap supra-competitive profits at the expense of Plaintiffs and the Class."  The U.S. Complaint alleges that "Defendants' top-level traders used electronic communications to meet and conspire for over a decade" using a variety of electronic fora, including chat rooms, instant messages and email.

The chat rooms, with evocative names such as "The Cartel," "The Bandits' Club," "The Mafia" and "One Team, One Dream," were the primary sites of conspiracy.  The Cartel, for example, counted traders from at least four Defendants among its members, including Citigroup, Barclays, UBS and JPMorgan, whose chief currency dealer in London ran the chat room.  The Cartel's members "exchanged information on customer orders and agreed to trading strategies to manipulate" the Fix.  After manipulating the Fix, members allegedly "would send written slaps on the back for a job well done."

In The Cartel and in other chat rooms, FX traders from the various Defendant banks shared inappropriate "market-sensitive information with rivals" including "information about pricing," their customers' orders and their net trading positions in advance of 4 p.m. London time.  The traders discussed the "types and volume of trades they planned to place."  Using this

nonpublic information, and "by agreeing in chat rooms and instant messages" to employ

collusive trading strategies, Defendants moved the Fix in the direction they desired and thereby

fixed the prices of the FX instruments.

The U.S. Complaint alleges that the risk of unilaterally manipulating the Fix was too

high, and that "[n]o one defendant could accomplish systematic and continuing manipulation of"

the Fix without coordination with its rivals.

FX traders typically used one of three strategies to "fix the Fix":

- "Front running" or "trading ahead" -- Defendants traded their own proprietary positions before executing their customers' large market-moving trades so that Defendants could take positions to their benefit and "to the detriment of the customer."

- "Banging the close" -- Because the calculation of the Fix does not weight the trades by amount traded and takes into account only the number of trades in any currency pair, traders conspired to impact the Fix by engaging in more trades. To this end, traders broke up larger orders into smaller amounts and concentrated the trades in the minutes before and after the Fixing Window to affect the Fix.

- "Painting the screen" -- Defendants' traders placed fake orders with other Defendants to create the illusion of trading activity in a given direction to move rates prior to the Fixing Window. These trades were not actually executed.

The U.S. Complaint alleges that the chat room exchanges were not isolated instances of

inter-firm communications by rogue employees, but common practice in a "market controlled by

a small and close-knit group of traders" whose "social and professional ties in the FX trading

community create[d] incentives and opportunities for collusion."

### 4. *Global Investigations, Penalties and Terminations*

On June 12, 2013, Bloomberg reported that FX traders at "some of the world's largest

banks" had been "rigging" the Fix by "pushing through trades before and during the 60-second

window when the benchmarks are set." During the fall of 2013 and the first quarter of 2014, the

media reported global investigations into the manipulation of the Fix, including in the United States, United Kingdom, European Union, Switzerland, Germany, Hong Kong, Singapore, Australia and New Zealand.  The U.S. Complaint identifies the investigating bodies, the Defendants involved in the investigation and explains the nature of the investigations.

Some of these investigations have resulted in settlements and penalties.[4]  On November 12, 2014, the Commodity Trading Futures Commission levied civil penalties of $310 million each on Citibank and JPMorgan, $290 million each on RBS and UBS, and $275 million on

---

[4] Federal Rule of Evidence 201 authorizes a court to "judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned . . . at any stage in the proceeding," including on a motion to dismiss.  *See, e.g.*, *Kramer v. Time Warner Inc*., 937 F.2d 767, 773 (2d Cir. 1991) ("Of course," a district court "may . . . consider matters of which judicial notice may be taken under Fed. R. Evid. 201" on a motion to dismiss.).  Accordingly, the Court takes judicial notice of the settlements and penalties involving Defendants based on various government agencies' press releases and the underlying orders "whose accuracy cannot reasonably be questioned" and which resulted from the investigations described in the U.S. Complaint.  *See, e.g.*, *McLoughlin v. People's United Bank, Inc*., 586 F. Supp. 2d 70, 73 (D. Conn. 2008) ("The Court may take judicial notice of the press releases of government agencies" (citing *In re Zyprexa Products Liability Litigation,* 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008)); *Mitchell v. Home*, 377 F. Supp. 2d 361, 367 n.1 (S.D.N.Y. 2005) ("The press release [from the New York Attorney General] may be considered on this motion to dismiss because . . . this Court may take judicial notice of it as a matter of public record").  *But see United States v. Int'l Longshoremen's Ass'n*, 518 F. Supp. 2d 422, 456 (E.D.N.Y. 2007) ("The scant Second Circuit authority on this point suggests that press releases are not subject to judicial notice.").  The Commodity Trading Futures Commission's press release and the underlying orders announcing the civil penalties are available at http://www.cftc.gov/PressRoom/PressReleases/pr7056-14 (the orders are available under the heading "Related Links").  The Officer of the Comptroller of Currency's press release and the underlying orders announcing assessing civil penalties are available at http://www.occ.gov/news-issuances/news-releases/2014/nr-occ-2014-157.html (the orders are available under the heading "Related Links").  The UK Financial Conduct Authority's press release and the underlying Final Notices announcing fines are available at http://www.fca.org.uk/news/fca-fines-five-banks-for-fx-failings (the Final Notices are available under the heading "Notes for Editors").  FINMA's press release and the underlying report are available at http://www.finma.ch/e/aktuell/pages/mm-ubs-devisenhandel-20141112.aspx (the final report is available as a related link).  All websites cited in this footnote were last visited on January 27, 2015.

HSBC; the Officer of the Comptroller of Currency assessed civil penalties of $250 million against Bank of America, and $350 million each against Citibank and JPMorgan; the UK-Financial Conduct Authority fined Citibank $358 million, HSBC $343 million, JPMorgan $352 million, RBS $344 million and UBS $371 million; and Switzerland's FINMA fined UBS (approximately) $139 million.  Other investigations remain ongoing.

Since the investigations began, all 12 Defendants have terminated, suspended or overseen the departure of over 30 long-time and key employees associated with their FX operations.  The U.S. Complaint identifies each such employee, his position and former employer.  Further, nine Defendants -- Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, JPMorgan, Morgan Stanley, RBS and UBS -- have banned their traders from multibank chat rooms.

**B.  The Foreign Actions**

The Foreign Complaints allege essentially the same facts as the U.S. Complaint.

The Simmtech Complaint brings suit against seven of the twelve Defendants in the Consolidated Action -- Barclays, Citibank,[5] Credit Suisse, Deutsche Bank, JPMorgan, RBS and UBS -- and alleges a shorter class period than the U.S. Complaint and the Larsen Complaint. The Simmtech Complaint is brought on behalf of Simmtech Co., Ltd. and a putative class of

> [a]ll natural and legal persons who traded foreign currency directly with a Defendant in the Republic of Korea between August 1, 2005 and the present which transaction was settled on the basis of WM/Reuters Rates.

The Larsen Complaint brings suit against all of the Defendants in the U.S. Complaint for the same class period as the U.S. Complaint, on behalf of Oddvar Larsen and a putative class of:

> [a]ll persons or entities located in Norway who engaged in foreign currency transactions directly with a Defendant during the period January 1, 2003 through

---

[5] The Simmtech Complaint also includes the Korean Citibank subsidiary as a defendant.

the present . . . , which actions were settled on the basis of WM/Reuters rates. Excluded from the Class are all United States persons and transactions occurring in the United States or its territories.

The Foreign Complaints allege violations of Section 1 of the Sherman Act, New York's Donnelly Act and New York's Consumer Protection Act.[6]

## II.    LEGAL STANDARD

On a motion to dismiss, the Court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party.  *See Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 68 (2d Cir. 2014).  In determining the adequacy of a complaint, courts "may consider any written instrument attached to the complaint as an exhibit or incorporated in the complaint by reference, as well as documents upon which the complaint relies and which are integral to the complaint."  *Subaru Distribs. Corp. v. Subaru of Am., Inc.*, 425 F.3d 119, 122 (2d Cir. 2005).  Courts may also take judicial notice of matters of public record when considering motions to dismiss.  *See Kramer*, *v. Time Warner Inc*., 937 F.2d 767, 773 (2d Cir. 1991).

To withstand dismissal, a pleading "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.  Rule 8 of the Federal Rules of Civil Procedure "requires factual allegations that are sufficient to 'give the defendant fair notice of what the . . . claim is and the

---

[6] The Larsen Complaint also alleges unjust enrichment, but counsel for Larsen explicitly withdrew that claim at oral argument.  Accordingly, Larsen's unjust enrichment claim is dismissed as withdrawn.

grounds upon which it rests.'"  *Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 182 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555).

## III.    DISCUSSION

Section 1 of the Sherman Act ("Section 1") bans "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States."  15 U.S.C. § 1.  Because two of the Plaintiffs in the Consolidated Action are domiciled in United States territories,[7] Plaintiffs also include a claim under Section 3 of the Act, which extends the protections of Section 1 to "any Territory of the United States or . . . the District of Columbia" and is substantively the same as Section 1.  *Id*. § 3.  Accordingly, the discussion below, like the parties' arguments in their submissions, is confined to Section 1.  All Plaintiffs assert their claims under Section 4 of the Clayton Act, which establishes a private right of action to enforce Section 1 to "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws," and provides for treble money damages and "the cost of the suit."  *Id.* § 15.

### A.  The Consolidated Action

Defendants argue that the U.S. Complaint should be dismissed on four principal grounds: (1) it does not adequately allege an agreement in restraint of trade as required by *Twombly*; (2) it does not adequately allege harm to competition; (3) it does not adequately allege an injury in fact; and (4) it fails to establish antitrust injury.[8]  These arguments are rejected.

---

[7] Plaintiff Virgin Islands Retirement System is domiciled in the Virgin Islands and Plaintiff Puerto Rico Retirement System is domiciled in Puerto Rico.

[8] Defendants initially advanced a fifth argument:  Plaintiffs' claims that arose from conduct that occurred more than four years prior to the first-filed complaint were time-barred.  At oral argument and at the Court's request, Defendants withdrew this argument without prejudice to

### 1.  *Sufficiency of Conspiracy Allegations*

The U.S. Complaint sufficiently alleges the existence of a conspiracy in violation of Section 1 of the Sherman Act, and that all Defendants were part of that conspiracy.

The central inquiry in a Section 1 case is whether the alleged conduct "stem[s] from independent decision or from an agreement, tacit or express."  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d. Cir. 2010) (quoting *Theatre Enters., Inc. v. Paramount Film Distrib. Corp.*, 346 U.S. 537, 540 (1954)).  To sustain a Section 1 conspiracy claim, a complaint must allege facts that show "joint or concerted action" that "reveal[s] 'a unity of purpose or a common design and understanding, or a meeting of minds in an unlawful arrangement.'"  *Anderson News*, 680 F.3d at 183 (quoting *Monsanto Co. v. Spray-Rite Service Corp.*, 465 U.S. 752, 761 (1984)).  Rule 8 does not "require heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570.  Absent a specific allegation of fraud, antitrust claims such as the one in the present case must satisfy Rule 8 and not the heightened pleading standard of Rule 9(b).  *See, e.g., Twombly*, 550 U.S. at 569 n.14; *Anderson News*, 680 F.3d at 182 (applying Rule 8 to a Section 1 claim); *Starr*, 592 F.3d at 321 (same); *In re Elevator Antitrust Litig.*, 502 F.3d 47, 49-50 (2d Cir. 2007) (same).

In particular, a complaint must "allege enough facts to support the inference that a conspiracy actually existed" by either direct or circumstantial evidence, because "in many antitrust cases" a "'smoking gun' can be hard to come by, especially at the pleading stage." *Mayor & City Council of Baltimore, Md. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). Because "conspiracies are rarely evidenced by explicit agreements," they "nearly always must be

---

renewal at a later stage.

proven through inferences that may fairly be drawn from the behavior of the alleged conspirators."  *Anderson News*, 680 F.3d at 183 (internal quotation marks omitted).

"Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact[s] to raise a reasonable expectation that discovery will reveal evidence of illegal agreement."  *Twombly*, 550 U.S. at 556. Further, "to present a plausible claim at the pleading stage, the plaintiff need not show that its allegations suggesting an agreement are more likely than not true or that they rule out the possibility of independent action," as required at later stages such as summary judgment. *Anderson News*, 680 F.3d at 184.  Thus, "a well-pleaded complaint may proceed even if . . . actual proof of those facts is improbable, and . . . a recovery is very remote and unlikely" as long as the complaint presents *a* plausible interpretation of wrongdoing.  *Twombly*, 550 U.S. at 556 (internal quotation marks omitted); *accord Anderson News*, 680 F.3d at 185.

Here, the U.S. Complaint meets the plausibility requirement.  The U.S. Complaint offers direct evidence akin to the "recorded phone call in which two competitors agreed to fix prices at a certain level" -- the Second Circuit's paradigmatic example of direct proof of a Section 1 violation.  *Mayor & City Council of Baltimore*, 709 F.3d at 136.  The U.S. Complaint alleges that FX traders from the Defendant banks used various electronic communications platforms, particularly chat rooms and instant messaging, to share "market-sensitive information with rivals" including price-information, customer information and their net trading positions before the setting of the Fix.  Based on this nonpublic information and "by agreeing in chat rooms and instant messages" to use collusive trading strategies across banks, Defendants manipulated the Fix to the price that they desired.  The U.S. Complaint contains specific allegations of chat room

participants congratulating each other about the manipulation of the Fix. Even the names the FX traders gave their chatrooms -- such as "The Cartel," "The Bandits' Club" and "The Mafia" -- support the inference that the chat rooms were used for anticompetitive purposes.

Because the U.S. Complaint specifically alleges that (i) the Fix is a "pricing mechanism" and the "primary benchmark for currency trading globally"; (ii) the Fix is the price at which Plaintiffs bought FX instruments from Defendants; and (iii) Defendants manipulated this price, the U.S. Complaint plausibly alleges a price-fixing conspiracy among horizontal competitors, a per se violation of the antitrust laws. *See Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 886 (2007) ("Restraints that are per se unlawful include horizontal agreements among competitors to fix prices[.]").

Defendants' argument that the existence of pending government investigations cannot support the inference of an unlawful conspiracy is unavailing. Certainly, the mere fact of pending investigations without more only raises, but does not respond to, the question of whether concerted wrongdoing occurred because the outcome and scope of such investigations are "pure speculation." *Hinds Cnty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) (internal citation omitted). Here, however, both the scope and outcome of at least some investigations is known. The Court has taken judicial notice of penalties and fines levied by regulators in three countries against six Defendants as a result of some of the investigations detailed in the U.S. Complaint and for the very conduct alleged in the Complaint. The penalties provide non-speculative support for the inference of a conspiracy.[9] In addition, while the fact of

---

[9] To the extent Defendants rely on cases from this District that dismissed antitrust actions in the LIBOR context despite the pendency and resolution of various government investigations, their reliance is misplaced because those cases were dismissed on antitrust injury grounds rather than

a single investigation may not be probative, the detailed allegations of investigations into the

manipulation of FX benchmark rates by regulators in seemingly every significant financial

market in the world lends some credence to the conspiracy allegation.  *Cf. Starr*, 592 F.3d at 325

(considering DOJ's "two new investigations into whether defendants engaged in collusion and

price fixing" in evaluating the plausibility of a complaint alleging a Section 1 violation).  Most

important, the reported investigations and their outcomes merely buttress the critical allegations

in the U.S. Complaint that detail how the benchmark was manipulated through actions that were

inherently collusive and conspiratorial -- the sharing of proprietary pricing information and

agreeing on trading strategies to manipulate the Fix.

Further, the U.S. Complaint cites various alleged facts from the investigations that, apart

from the fact of the investigations, support the inference of a conspiracy, including:

- A JPMorgan trader wrote messages to his counterparts at other firms that included details of his trading positions, according to a transcript provided by RBS to the UK Financial Conduct Authority.

- Traders from Citigroup and RBS among others were present at a meeting in which they told the Bank of England that they shared information about customer orders before currency benchmarks were set.

- A Deutsche Bank trader boasted in an electronic chat about his ability to influence the currency markets, according to a transcript obtained by the DOJ and FBI.

---

plausibility grounds.  *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 935 F. Supp. 2d 666, 739 (S.D.N.Y. 2013) (finding dismissal warranted "although we are fully cognizant of the settlements that several of the defendants here have entered into with government regulators" because plaintiffs failed to meet the requirements of antitrust injury); *Laydon v. Mizuho Bank, Ltd.*, No. 12 Civ. 3419, 2014 WL 1280464, at *10-12 (S.D.N.Y. Mar. 28, 2014) (finding dismissal warranted on antitrust injury grounds, but also stating, without any discussion of investigations or settlements and in dicta, that complaint did not sufficiently allege restraint of trade).

Defendants contend that the U.S. Complaint lumps all Defendants together and pleads insufficient facts to connect each Defendant to the conspiracy.  Consequently, they argue, the U.S. Complaint makes generalized and conclusory allegations about Defendants like the dismissed complaints in *Twombly* and *In re Elevator Antitrust Litigation*.

Defendants' reading of the U.S. Complaint is unpersuasive -- the U.S. Complaint offers neither "a list of theoretical possibilities, which one could postulate without knowing any facts whatever," *In re Elevator Antitrust Litig.*, 502 F.3d at 50-51, nor "conclusory allegation[s] of agreement at some unidentified point" based on mere parallel conduct, *Twombly*, 550 U.S. at 557.  Rather, in addition to describing the alleged conspiracy in great detail, the U.S. Complaint makes specific allegations regarding each Defendant.  With regard to several, the U.S. Complaint alleges that they enjoyed a significant share of the global FX market; that their traders were members of The Cartel chat room; after public announcements of the investigations and allegations of a horizontal price-fixing conspiracy, they banned their traders from participating in multi-bank chat rooms; they fired or otherwise oversaw the departure of one or more of their key FX traders during the six-month period when global investigations were widely reported; and they were not only subject to, but have been penalized as a result of, regulatory investigations. The U.S. Complaint also specifies other damning details and anecdotes such as those in the bullet points above.  Even as to Defendants about whom the allegations are least substantial, the U.S. Complaint includes allegations of market share, being subject to investigations and the termination or departure of key figures in their global FX business in the wake of the investigations.  Reading the U.S. Complaint in its entirety and drawing all inferences in Plaintiffs' favor, it can be inferred that even those Defendants whose traders the U.S. Complaint

15

does not name as part of any chat room were nevertheless implicated, based on Defendants' own actions such as banning multibank chat rooms and firing or suspending FX traders.

Defendants' argument that the U.S. Complaint should be dismissed because it fails to allege which Defendants conspired when and about which exact currency pairs is also unavailing. *Twombly* suggests in dicta that a complaint that specifies "no specific time, place, or person involved in the alleged conspiracies" may violate the notice requirement of Rule 8. 550 U.S. at 565 n.10; *see Starr*, 592 F.3d at 325 (characterizing the discussion of date and time specifications in *Twombly* as dicta). The U.S. Complaint, however, is not akin to the conclusory hypothetical complaint *Twombly* posits, and more than satisfies the notice requirements of Rule 8. The U.S. Complaint plausibly alleges that FX traders at Defendant banks (the persons) entered into conspiratorial agreements via electronic fora (the place) in advance of 4 p.m. London time (a specific time) repeatedly during the class period. It puts Defendants on notice of the nature of the agreements at issue, as well as how those agreements came into being. Even in the absence of specific allegations identifying the exact date and time of each illicit act, the U.S. Complaint gives "defendant[s] fair notice of what the claim is and the grounds upon which it rests." *Anderson News*, 680 F.3d at 182 (quoting *Twombly*, 550 U.S. at 555) (alterations omitted).

Finally, Defendants' argument that the conspiracy does not make economic sense is unavailing at the pleading stage. Plaintiffs have proffered a plausible rationale that must await closer scrutiny at a later stage: sharing customer orders and net positions before the setting of the Fix allowed Defendants to take large proprietary positions and make trades that would have been too risky to undertake absent collusion. The exchange of information allowed Defendants to

know the likely direction of price movements at the Fix and then push the Fix to their benefit. Absent collusion and information about other Defendants' trading positions, the risk of manipulating the Fix was too high.  With collusion and free access to trade and price information, Defendants could line up their orders to maximize their profits from consumers like Plaintiffs who were relying on the Fix as the price.  The logic is at least facially simple and intuitive -- price-fixing to maximize profits at the expense of consumers.

Fairly read, the U.S. Complaint adequately alleges that Defendants engaged in a long-running conspiracy to manipulate the Fix to Defendants' advantage.  Because the U.S. Complaint contains sufficient factual material to "raise a reasonable expectation that discovery will reveal evidence of illegal agreement," *Twombly*, 550 U.S. at 556, the motion to dismiss the U.S. Complaint for failing to allege sufficiently a conspiracy in restraint of trade is denied.

### 2.  *Harm to Competition*

Defendants argue that the U.S. Complaint must be dismissed because it does not plead sufficient harm to competition.  However, a complaint that sufficiently pleads a per se violation need not separately plead harm to competition.  *See, e.g.*, *Leegin Creative Leather Prods., Inc.*, 551 U.S. at 886 (per se violations are "necessarily illegal" and "eliminate[] the need to study the reasonableness of an individual restraint in light of the real market forces at work").  The U.S. Complaint plausibly alleges a horizontal price-fixing conspiracy, which is "thought so inherently anticompetitive that [it] is illegal per se without inquiry into the harm it has actually caused." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984).

The U.S. Complaint specifically alleges that the Fix is the price at which Plaintiffs actually purchased FX instruments from Defendants.  Defendants' argument that the Fix rates are

no more than "indices" that "constitute information" rests on a misreading of the U.S. Complaint, as does their attempt to recharacterize the alleged wrong as the practices of "front running," "banging the close" and "painting the screen," rather than the per se violation of fixing the price *through* those practices.

Defendants also suggest that they are not horizontal competitors for purposes of the Fix. Defendants argue that because the Fix "will be the same regardless of the dealer with which the customer transacts," they are not competing in the market for the Fix.  Such arguments also misconstrue the U.S. Complaint.  The U.S. Complaint specifically alleges that "Defendants are horizontal competitors in the FX market" who compete for customers by supplying different bid and ask quotations.  The U.S. Complaint also alleges that many customers, such as Plaintiffs, choose to transact at the Fix, which is a price.  The Fix is set on the basis of transactions in which Defendants are supposed to be offering competitive bid and ask quotes.  The U.S. Complaint alleges that because of Defendants' collusion (1) Plaintiffs who transacted during the Fixing Window received and therefore paid non-competitive quotes and (2) Plaintiffs who had agreed to transact at the Fix were similarly overcharged.  In short, the U.S. Complaint alleges that horizontal competitors fixed prices.

Accordingly, the motion to dismiss the U.S. Complaint for its alleged failure to demonstrate harm to competition is denied.

### 3.  *Injury in Fact*

Defendants argue that the U.S. Complaint fails to "allege facts that, if proven, would establish . . . *actual harm* in *real trades* in *specific currencies* on *particular days*."  (emphases in original).  Defendants contend that the U.S. Complaint does not adequately allege an injury in

18

fact, a requisite for standing, because, absent such specifics, any allegation of harm is conclusory.  Defendants' argument is rejected.

Plaintiffs "must have suffered an injury-in-fact, that is, the invasion of a 'legally protected interest' in a manner that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).  The standing requirements ensure that judicial resources are "devoted to those disputes in which the parties have a concrete stake." *Id.* (quoting *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc*., 528 U.S. 167, 191 (2000)). Plaintiffs have demonstrated that they have a concrete stake in the present action.  Each named Plaintiff claims that it was injured by having to pay supra-competitive prices as a result of Defendants' manipulation of the Fix.

Defendants conceded at oral argument, as they must, that any particular transaction that a particular Plaintiff entered into with a particular Defendant on a day that the Fix was manipulated to that Plaintiff's detriment would sufficiently demonstrate injury in fact as to that Plaintiff.  Defendants' argument based on injury in fact, like their argument based on plausibility, ultimately amounts to a demand for specifics that are not required, and that Plaintiffs could not be reasonably expected to know, at the pleading stage.

Discovery may show that, for particular transactions, some Plaintiffs benefited instead of being harmed by the manipulation of the Fix, but "the fact that an injury may be outweighed by other benefits, while often sufficient to defeat a claim for damages, does not negate standing." *Ross v. Bank of America N.A.*, 524 F.3d 217, 222 (2d Cir. 2008).  The U.S. Complaint's plausible allegations about an overarching conspiracy among horizontal competitors to fix prices that

resulted in Plaintiffs paying overcharges satisfy the injury-in-fact requirement at the pleading stage.

### 4. *Antitrust Injury*

Relying chiefly on *In re LIBOR-Based Financial Instruments Antitrust Litigation*, 935 F. Supp. 2d 666, 739 (S.D.N.Y. 2013) ("*LIBOR I*"), Defendants argue that Plaintiffs have not alleged harm to competition, and therefore have not pleaded an antitrust injury to establish standing under the Clayton Act.[10]  That argument fails.

"The requirement that plaintiffs demonstrate antitrust injury when bringing a private antitrust action 'ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place.'"  *Gatt Commc'ns, Inc. v. PMC Assocs., L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013) (quoting *Atl. Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 342 (1990) ("*ARCO*")).  Courts in the Second Circuit employ a "three-step process for determining whether a plaintiff has sufficiently alleged antitrust injury."  *Id.*  "First, the party asserting that it has been injured by an illegal anticompetitive practice must identify the practice complained of and the reasons such a practice is or might be anticompetitive."  *Id.* (internal quotation marks and alteration omitted).  Second, courts "identify the actual injury the plaintiff alleges," i.e., "the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct."  *Id.* (internal quotation marks omitted).  Third, courts compare the "anticompetitive effect of the specific practice at issue" to "the actual injury the plaintiff

---

[10] To sustain a private antitrust action, a plaintiff must demonstrate antitrust standing.  To do so, it must plausibly allege (1) that it suffered antitrust injury and (2) that it "is an 'efficient enforcer' of the antitrust laws."  *Gatt Commc'ns, Inc. v. PMC Associates, L.L.C.*, 711 F.3d 68, 76 (2d Cir. 2013).  Plaintiffs' status as "efficient enforcers" has not been challenged, and, in any case, such a challenge would be unsuccessful.  Accordingly, this Opinion evaluates only whether the U.S. Complaint plausibly alleges that Plaintiffs suffered antitrust injury.

alleges." *Id.* (internal quotation marks omitted). "It is not enough for the actual injury to be causally linked" to the asserted violation, but instead, "in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Id.* (internal quotation marks and alteration omitted).

The U.S. Complaint adequately pleads antitrust injury. It alleges that Defendants, who are horizontal competitors, engaged in price-fixing, which caused Plaintiffs to pay supra-competitive prices. "In this case, the plaintiffs are purchasers of the defendants' product who allege being forced to pay supra-competitive prices as a result of the defendants' anticompetitive conduct. Such an injury plainly is 'of the type the antitrust laws were intended to prevent.'" *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 688 (2d Cir. 2009) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)); *see also Associated Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 530 (1983) ("Congress was primarily interested in creating an effective remedy for consumers who were forced to pay excessive prices by the giant trusts and combinations that dominated certain interstate markets."). Consequently, Defendants' efforts to show the absence of antitrust injury necessarily fail.

Defendants' reliance on *LIBOR I* in urging a contrary conclusion is unavailing. As an initial matter, *LIBOR I*'s conclusion that the plaintiffs in that case had not demonstrated antitrust injury was explicitly based on that court's understanding that the LIBOR-setting process was a "cooperative endeavor wherein otherwise-competing banks agreed to submit estimates of their borrowing costs . . . to facilitate the . . . calculation of an interest rate index." 935 F. Supp. 2d at

688.  The Fix, by contrast, is set by actual transactions in a market where Defendants are

supposed to be perpetually competing by offering independently determined bid-ask spreads.

Defendants argue that because "plaintiffs would have suffered the same injury from any

alleged manipulation of the London fix" even if "individual defendants had unilaterally engaged

in such manipulation," there can be no antitrust injury.  However, that argument would doom

almost every price-fixing claim at the pleading stage.  Simply because conduct can be legal when

undertaken individually, does not prevent it from becoming illegal if undertaken collusively --

that is the essence of a conspiracy.

Defendants' argument -- that there can be no antitrust injury where they could have

accomplished unilaterally the same result that they allegedly achieved through collusion -- does

not even implicate the concept of antitrust injury.  The argument has nothing to do with whether

Plaintiffs allege that they suffered an injury of the kind the antitrust laws were intended to

prevent -- which they do.  Rather, Defendants' argument, if accepted, would impose an

additional pleading requirement: that private antitrust plaintiffs must plead that the alleged

antitrust violation could not have occurred through Defendants' unilateral action.  Such a

pleading requirement has no support in the law.  While a plaintiff must present evidence to "rule

out the possibility of independent action" at summary judgment or trial in order to prove an

illegal conspiracy, no such requirement applies at the pleading stage.  *Anderson News*, 680 F.3d

at 184; *Starr*, 592 F.3d at 325 ("Defendants . . . argue that a plaintiff seeking damages under

Section 1 of the Sherman [A]ct must allege facts that tend to exclude independent self-interested

conduct as an explanation for defendants' parallel behavior.  This is incorrect.") (internal

quotations and alteration omitted); *see also Twombly* 550 U.S. at 556 (stating a Section 1

conspiracy claim requires alleging "plausible grounds to infer an agreement [and] does not impose a probability requirement at the pleading stage").  As is well established, "[a] court ruling on . . . a motion [to dismiss] may not properly dismiss a complaint that states a plausible version of the events merely because the court finds a different version," such as unilateral self-interested conduct, equally or even "more plausible."  *Anderson News*, 680 F.3d at 185.  The U.S. Complaint adequately pleads facts that plausibly suggest an unlawful agreement among Defendants that caused Plaintiffs the type of injury the antitrust laws were designed to address. The U.S. Complaint need plead no more to withstand dismissal.

To the extent *LIBOR I* suggests that no antitrust injury will be found at the pleading stage where "the harm alleged . . . could have resulted from normal competitive conduct," 935 F. Supp. 2d at 690, this Court respectfully disagrees with its conclusion because it blurs the lines between two separate analytic categories -- the sufficiency of a complaint under *Twombly* and antitrust injury.  *LIBOR I*'s conclusion that such an analysis should be conducted at the pleading stage is unpersuasive for the additional reason that it relies on two inapposite Supreme Court cases -- *Brunswick* and *ARCO*.  *See LIBOR 1*, 935 F. Supp. 2d at 689-92 (discussing *Brunswick*, 429 U.S. 477 and *ARCO*, 495 U.S. 328).

First, neither *Brunswick* nor *ARCO* addressed the sufficiency of a complaint on a motion to dismiss.  *See ARCO*, 495 U.S. at 333 (reviewing the Ninth Circuit's reversal of the District Court's summary judgment decision); *Brunswick*, 429 U.S. at 481 (reviewing the Third Circuit's reversal based on the District Court's jury instructions).  Because summary judgment and trial standards are inappropriate on a motion to dismiss, *see Anderson News*, 680 F.3d at 184, the two

cases provide little, if any, guidance in evaluating the U.S. Complaint for purposes of the present motion.

Second and most important, both *Brunswick* and *ARCO* involved claims and facts where the plaintiffs could show no anticompetitive injury, and not because the plaintiffs could have suffered the same harm under normal circumstances of free competition.  *Brunswick* and *ARCO* were brought by competitors against their rivals, not by consumers alleging the per se wrong of horizontal price-fixing against colluding competitors as in the present case.  *ARCO* held that the injury suffered by a plaintiff when its rival lowers prices to non-predatory levels pursuant to a vertical agreement "cannot be viewed as an 'anticompetitive' consequence of the claimed violation.  A firm complaining about the harm it suffers from nonpredatory price competition is really claiming that it is unable to raise prices.  This is not *antitrust* injury . . . ."  495 U.S. at 337-38 (emphasis in original; internal quotation marks and citations omitted).  In *Brunswick*, a group of bowling centers brought suit against a company that was acquiring other financially distressed bowling centers and allowing them to survive instead of going bankrupt.  Recognizing that the plaintiffs' theory of antitrust injury amounted to claiming that increased competition had reduced their profits, the Supreme Court held that it was "inimical to the purposes of [the antitrust] laws to award damages" for such an injury.  *Brunswick*, 429 U.S. at 488 (internal quotation marks and citations omitted).  In finding no antitrust injury, both cases reaffirmed the Supreme Court's seminal observation in *Brown Shoe Co. v. United States* that the antitrust laws are "concern[ed] with the protection of *competition*, not *competitors*."  370 U.S. 294, 320 (1962) (emphases in original); *see ARCO*, 495 U.S. at 338; *Brunswick*, 429 U.S. at 488.  The instant

case is readily distinguishable because a consumer's injury of having to pay supra-competitive prices as a result of a horizontal price-fixing conspiracy is the quintessential antitrust injury.

In sum, Defendants' motion to dismiss the U.S. Complaint for its alleged failure to plead antitrust injury is denied.

### B. The Foreign Actions

The Foreign Complaints are dismissed. The Sherman Act claims are barred by the Foreign Trade Antitrust Improvements Act ("FTAIA"), and the New York state law claims have an insufficient nexus to New York.

### 1. FTAIA Claims

The FTAIA provides:

> [The Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless --
> (1) such conduct has a direct, substantial, and reasonably foreseeable effect --
> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and
> (2) such effect gives rise to a claim under the [Sherman Act].
> If [the Sherman Act] appl[ies] to such conduct only because of the operation of paragraph (1)(B), then sections 1 to 7 of this title shall apply to such conduct only for injury to export business in the United States.

15 U.S.C. §6a. The Supreme Court has explained:

> This technical language initially lays down a general rule placing *all* (nonimport) activity involving foreign commerce outside the Sherman Act's reach. It then brings such conduct back within the Sherman Act's reach *provided that* the conduct *both* (1) sufficiently affects American commerce, *i.e.*, it has a "direct, substantial, and reasonably foreseeable effect" on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the "effect" must "giv[e] rise to a [Sherman Act] claim."

*F. Hoffmann-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 162 (2004) (alterations and emphases in original) (quoting 15 U.S.C. § 6a) ("*Empagran*").  Because the Foreign Complaints' Section 1 claims implicate exclusively foreign activity that does not sufficiently affect American commerce, they are dismissed.

The Foreign Complaints seek to apply American antitrust laws to Defendants' foreign conduct for harm suffered outside the United States by Foreign Plaintiffs and their putative classes.  The Larsen Complaint expressly excludes "all United States persons and transactions occurring in the United States or its territories."  The Simmtech Complaint similarly confines its claims only to those arising out of FX transactions "in the Republic of Korea."  Under principles of comity, such claims necessarily fall outside the Sherman Act's purview.  *See Empagran*, 542 U.S. at 165, 169 ("Where foreign anticompetitive conduct plays a significant role and where foreign injury is independent of domestic effects, . . . Congress, we must assume, would not have tried to impose" American antitrust laws on other nations "in an act of legal imperialism, through legislative fiat.").

Foreign Plaintiffs unsuccessfully try to shoehorn their Section 1 claims into FTAIA's exceptions.  They argue that Defendants' conduct falls under the "import commerce" exception. To satisfy the "import commerce" exception, the Foreign Complaints must allege facts that plausibly show that "the conduct by the defendants . . . was directed at an import market." *Kruman v. Christie's Int'l PLC*, 284 F.3d 384, 395 (2d Cir. 2002), *abrogated on other grounds by Empagran*, 542 U.S. 155.  The Foreign Complaints fail to plead, nor could they plead consistent with their theory of liability, that Defendants' manipulation of the Fix, which allegedly impacted currencies worldwide, was directed at the U.S. import market.

In support of their "import commerce" argument, Plaintiffs identify the following allegations in the Foreign Complaints: (1) that the relevant class members "entered into FOREX transactions in Norway directly with one or more American Defendants" in the Larsen Complaint; (2) that "many of these FOREX transactions involved Defendants' importation of currency they received into United States accounts" in the Larsen Complaint; and (3) that a "spot FX trade is a transaction between two counterparties to exchange sums of currencies on a settlement date in two bank business days via the exchange of bank deposits in the respective countries" in the Simmtech Complaint.

None of these allegations satisfy the Foreign Complaints' burden of pleading that Defendants' conduct was *directed* at an import market. The Simmtech Complaint fails to make an allegation about any kind of import market, however generously defined. The Larsen Complaint similarly fails to plead that Defendants' conduct was specifically directed at an import market in the United States. Indeed, both complaints allege that their respective Plaintiffs suffered harm outside the United States while participating in what the Larsen Complaint calls a large "global decentralized" market and the Simmtech Complaint calls a "worldwide competitive market."

In *Kruman*, the Second Circuit held that where defendants had engaged in a conspiracy "directed at controlling the prices they charged for their services in foreign auctions," the "import commerce" exception did not apply. *Id.* at 395. That "some of the goods purchased in those auctions," like some currency that was bought and sold in this case, "may ultimately have been imported by individuals in the United States" did not relieve the plaintiffs' burden of showing that the defendants specifically targeted an import market in the United States. *Id.* at

395-96.  Because Defendants' conduct was directed at manipulating prices charged for extraterritorial FX transactions, FTAIA's "import commerce" exception does not apply.  *Cf. Animal Sci. Prods, Inc. v. China Minmetals Corp.*, 654 F.3d 462, 470 (3d Cir. 2011), *as amended* (Oct. 7, 2011) (explaining that the "import trade" exception applied in a case where plaintiffs alleged "that defendants engaged in a course of activity designed to ensure that only United States importers, and not United States retailers, could bring oriental rugs manufactured abroad into the stream of American commerce," but not in a case where defendants' "actions did not directly increase or reduce imports into the United States.").

The Foreign Plaintiffs also fail to satisfy FTAIA's "domestic effects" exception, which requires that they plausibly plead: (1) that Defendants' anticompetitive conduct had a "domestic effect," i.e., a "direct, substantial and reasonably foreseeable effect" on U.S. domestic commerce, 15 U.S.C. § 6a(1); and (2) that such a domestic effect "gives rise to" Plaintiffs' injuries, *id.*, § 6a(2).  To satisfy the second limitation, the Foreign Complaints must plausibly allege that the domestic effects of Defendants' anticompetitive conduct proximately caused their injury.  *Lotes Co. v. Hon Hai Precision Indus. Co.*, 753 F.3d 395, 414 (2d Cir. 2014).

The Foreign Plaintiffs state that the domestic effects in the United States of Defendants' conspiracy proximately caused them injury because "*without the domestic effects*, there would be *no* foreign injury to Plaintiffs."  (emphases in original).  However, this argument runs counter to the Foreign Complaints' central allegations of a global conspiracy that simultaneously and independently injured all FX instrument purchasers trading at, or during the setting of, the Fix, whether in the United States, Norway, South Korea, or elsewhere.  They also argue, somewhat unclearly, that "but for Defendants' conspiracy on the United States commerce, they were

injured in Norway and South Korea because they had to pay the same identical supra-competitive prices that American consumers paid." Again, even generously read, this argument fails to show how any domestic effects proximately *caused* Foreign Plaintiffs injury. Instead, by conceding that all FX purchasers across the world paid the same supra-competitive prices, this argument provides further support for the Foreign Complaints' allegations of a global conspiracy that independently caused Foreign Plaintiffs harm in their home countries. Accordingly, any domestic effect in the United States of Defendants' anticompetitive conduct "is not even a factual, 'but for' cause" of Foreign Plaintiffs' injury, let alone a proximate cause. *Lotes Co.*, 753 F.3d at 415. "[R]egardless of what effect defendants' conduct ha[d] on U.S. domestic or import commerce, any such effect did not give rise to the plaintiff[s'] claim[s]." *Id.* at 398 (alterations and quotation marks omitted). Consequently, the "domestic effects" exception does not apply.

### 2. *New York State Law Claims*

The Donnelly Act "cannot reach foreign conduct deliberately placed by Congress beyond the Sherman Act's jurisdiction." *Global Reins. Corp. U.S. Branch v. Equitas Ltd.*, 18 N.Y.3d 722, 735 (2012). The Foreign Complaints' Section 1 claims are beyond the Sherman Act's reach. Accordingly, Defendants' Donnelly Act claims are dismissed.

Each Foreign Complaint also includes a cause of action under New York's Consumer Protection Act, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." N.Y. Gen. Bus. Law § 349(a). But "to qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." *Goshen v. Mut. Life Ins. Co. of New York*, 98 N.Y.2d 314, 325 (2002). Here, there is no dispute that any deception of customers that the Foreign Complaints allege did

not occur in New York.  Accordingly, the Foreign Complaints' Consumer Protection Act claims are dismissed.

### 3.  *Leave to Amend*

To the extent Foreign Plaintiffs seek leave to amend their Complaints, leave is denied as futile.  The principles of comity articulated in *Empagran* do not allow a cause of action under the Sherman Act for the exclusively foreign conduct that the Foreign Complaints allege.  The lack of sufficient nexus to New York similarly dooms Foreign Plaintiffs' state law claims.  Because any "proposed amendments would fail to cure prior deficiencies or to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure," leave to amend is denied as futile.  *Panther Partners Inc. v. Ikanos Commc'ns, Inc*., 681 F.3d 114, 119 (2d Cir. 2012).

## IV.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is DENIED as to the Consolidated Action and GRANTED as to the Foreign Actions.  The Foreign Actions are DISMISSED WITH PREJUDICE.

The Clerk of Court is directed to close the motions at Dkt. Nos. 208 and 209 in 13 Civ. 7789; Dkt No. 81 in 13 Civ. 7953; and Dkt. No. 49 in 14 Civ. 1364.  The Clerk is further directed to close the following cases: 13 Civ. 7953 and 14 Civ. 1364.

SO ORDERED.

Dated: January 28, 2015
       New York, New York

**LORNA G. SCHOFIELD**
**UNITED STATES DISTRICT JUDGE**

30